### BLACKLEDGE v. J. M. SHOCK ABSORBER CO. et al.

(District Court, N. D. Illinois, E. D. May 6, 1914.)

1. PATENTS (§ 311*)—SUIT FOR INFRINGEMENT—EVIDENCE—PLEADING.

Where defendant in an infringement suit introduced a prior patent for the purpose of limiting the scope of the patent in suit, it was proper for complainant in rebuttal to introduce the testimony of the prior patentee to show that his invention was not successful because it lacked an element supplied by the patent in suit, and it was not necessary that such evidence should have been pleaded in the bill.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 541, 542; Dec. Dig. § 311.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SHOCK ABSORBER.

The Tilt patent No. 988,229 for a shock absorber for automobiles held valid and infringed by the device of the Jacquet patent No. 1,015,682.

In Equity. Suit by John W. Blackledge against the J. M. Shock Absorber Company and Albert J. Dueth and Alexander J. Dueth, doing business as the Alfredal Company. On final hearing. Decree for complainant.

Sheridan, Wilkinson & Scott, of Chicago, Ill., for complainant.
Kerr, Page, Cooper & Hayward, of New York City, and S. E. Hibben, of Chicago, Ill., for defendants.

SANBORN, District Judge. Infringement suit on patent No. 988,-229, issued to Charles A. Tilt March 28, 1911, on a shock-absorbing

device for automobiles, the latest form of which is called the "Velvet," claiming infringement by a device known as the "J. M." shock absorber, made under patent No. 1,015,682, January 23, 1912, by L. P. C. J. Jacquet, who is also known as Jacquet Maurel. Lack of novelty and noninfringement are pleaded in the answer, but at the hearing defendants' counsel conceded the validity of the first two claims of the Tilt patent sued on, and stated that the only proposition seriously urged by defendants was that they did not infringe. This concession was later conditionally withdrawn.

[1] A question of pleading under the new equity rules came up in the following way: Plaintiff made his prima facie case by calling a patent expert, who explained the device and the claims in suit, and pointed out how, in his opinion, the J. M. device was an infringement. Defendants then offered evidence explaining and comparing the two devices, and certain prior patents and publications for the purpose of limiting the scope of the Tilt invention. Among others a patent to S. Furmidge, No. 807,612, was offered. After defendants had closed their case plaintiff called Mr. Furmidge as a witness. On being requested by counsel for defendants to state the purpose of calling him, plaintiff's counsel said it was to show that the Furmidge devices were made in considerable quantities, but proved to be failures commercially and practically because they lacked the invention of the patent in suit. The proposed evidence was objected to because not pleaded, because defendants do not rely on Furmidge as an anticipation, and as irrelevant. Furmidge testified that he had sold 10,000 sets of absorbers, but they were a failure because they permitted lateral or swaying motions between the body and axle, and that this was remedied by the Tilt patent. Defendants moved to strike out all of Furmidge's testimony on the grounds mentioned in their objection, calling attention to Acme Steel Goods Co. v. American Metal Fastener Co. (D. C.) 206 Fed. 478, in this court, where similar evidence, but covering a much wider field, was not permitted to go in as part of plaintiff's prima facie case, without amendment.

Defendants having shown the Furmidge patent for the purpose of limiting the Tilt invention, it was proper for plaintiff to rebut the prima facie force of Furmidge by proving just what position in the art he occupied, and how Tilt supplied just what Furmidge lacked, in order that the court may be able to see what advance in the art Tilt made. And as this evidence is in reply to proof offered by defendants, tending to explain or answer it, and lessen its presumptive effect, it may be put in without pleading. There was no opportunity to plead it in the bill, nor is it part of plaintiff's case, being merely explanatory of evidence for the defense.

Defendants' counsel having moved to exclude the Furmidge testimony, gave notice that if the motion was denied they would withdraw their admission of validity of the Tilt patent, so far as to claim that the Furmidge testimony shows that patent to be invalid. I think it does not show this, and that it was not irrelevant, but admissible to show the extent of the advance in the art made by Tilt. It enables the court to understand the great importance in the art of the vertical

guides and sleeves, and their function in preventing side-sway; also in giving Tilt his true place in the art, and to what range of equivalents he is entitled.

[2] The two shock absorbers consist of a group of coiled springs between the ends of the elliptical springs of an automobile, in place of the ordinary shackle. As these car springs must be strong enough to sustain the weight of the car body and load they are necessarily made so stiff that they cannot vibrate with the frequency essential to the entire comfort of the passengers. By putting small and comparatively weak auxiliary coiled springs between the ends of the car springs, or under their ends if of the platform type, the vibrations are much increased in number, and the strong shocks, due to the bumps of the road, greatly softened or absorbed.

It is not enough, however, merely to interpose a bunch of coiled springs into the car spring mechanism, because lateral movement or side-sway between the spring ends must also be prevented. Earlier attempts of invention had failed for this very reason, as in the case of Furmidge already referred to, but the problem was solved both by the Tilt and Jacquet inventions, which preserve the essential rigidity of the shackle by providing strong vertical guides in the form of rods inside the coiled springs, with metal sleeves which may slide up and down over the rods, within the range of the spring vibration. Neither Tilt nor Jacquet discovered anything new so far as the coiled springs themselves go, the entire novelty being in a peculiarly ingenious manner of associating the springs, guides and sleeves, and in Jacquet in extending the sleeve the whole length of the device by circular casings with the lower ends of the guides pistoning therein.

The Tilt patent device may be very roughly compared to a very small four-legged stool with a double seat, the tops of the legs solidly fastened to the upper seat and sliding like pistons through holes in the lower seat. Now, suppose the bottom ends of the legs are mounted on a plate, and between this plate and the lower seat spiral springs are placed, one around each leg. These springs may be supposed to be of proper size and strength to hold by their expansion the bottom seat of the stool up against the upper seat. This description is good enough for the Blackledge absorber before it is put on the car, and the elements of the combination are: (1) The upper stool-seat, firmly supported by the tops of the legs; (2) the lower seat sliding up and down on the legs; (3) the legs themselves; (4) the spiral springs inclosing the legs; and (5) the bottom plate attached to the bottom ends of the four legs. If now the shackle be taken out from between the spring-ends of an automobile, and the supposed stool substituted, we have a rough notion of the "Velvet" or Tilt absorber.

To apply terms of the art to the supposed stool, the upper seat is the head, sustaining the upper ends of the rods or stool-legs, the lower seat is the sliding sleeve, and the legs are the guide rods running through the sleeve.

In order that the absorber may be attached to the car, the shackle is removed and replaced by it. The shackle consists of four pieces of steel, two bolts and two links, firmly joined at their ends in the form

of a rectangle. It is used to connect the ends of the elliptical springs of the car, and prevent lateral motion between the spring-ends. Conceive the middle parts of the head and sleeve of the absorber to be cut out, and their places taken by bolts similar to the two shackle bolts, leaving the head and sleeve in the form of dumbells, and it will be clear that the absorber may be put in between the spring-ends, so that the spiral springs will relieve the shocks due to the car passing over a rough road. The upper or body-spring is attached to the lower bolt which passes through the sleeve, and the lower or axle-spring to the upper bolt connecting the absorber-head.

When we come to compare the J. M. device with the "Velvet" absorber, a very different structure is found; the two being unlike in every particular in form or manufacture, but similar in operation and result. The following comparison in parallel columns will serve to indicate how unlike they are in construction:

| The "Velvet." | The J. M. |
|---|---|
| 1. A head, fastened to the rods or guides. | 1. A head, not attached to the rods, except by the weight of the car-body. |
| 2. A sliding sleeve just below the head, moving upon the guide rods. | 2. A sliding sleeve just below the head, to which a cylinder or casing is welded or cast, serving to carry the sliding sleeve to the bottom of the device by inclosing the bottom plate so that the latter, while remaining stationary relatively to the head, changes its position relatively to the sliding sleeve and the casing. |
| 3. Four guide rods, joined to the head and bottom plate. | 3. Two guide rods, each in the form of a hairpin, hung loosely over the head, held thereon by the weight of the car-body, and loosely joined to the center of a circular bottom plate. |
| 4. Four spiral springs, each inclosing a single rod, placed between the sliding sleeve and bottom plate, and bearing against each. | 4. Two spiral springs, each inclosing the two arms of a hairpin shaped rod, each separately inclosed in a cylinder or casing, and placed between the sliding sleeve and the bottom plate. |
| 5. A bottom plate, fastened to the lower ends of the rods, stationary with respect to the head, but changing position relatively to the sliding sleeve. | 5. A bottom plate, fastened to the lower ends of the rods, acting in the bottom of the casing as a piston, so as to extend the sliding sleeve to the lower end of the casing, and stationary relatively to the head, but changing position relatively to the sleeve and casing. |

When the car wheels go into a rut or pocket, or over a stone, the weight or momentum of the movement is taken up first by the body-spring, and transmitted in succession to the sleeve-bolt, the springs, the bottom plate, the head bolt, the axle-spring and lastly to the axle itself. The two devices are thus resilient shackles, cushioning either downward or upward movement of the car body, but preventing side-sway like the shackle itself.

Both patents are meritorious, Jacquet the more highly developed of the two. Each has been independently produced, without any copying or borrowing of ideas from each other. Unless Tilt has clearly

pre-empted the field, so as to leave nothing but improvement to Jacquet, defendants' device cannot, of course, be held to infringe.

Only the first of the three claims of the patent in suit is here in question, since the second requires a rigid connection between the guides and the head blocks, and the third provides for two additional pairs of coiled springs between the head blocks and sleeves. Neither of these elements are in the J. M. device.

Such first claim covers the following elements: The combination with the two members of a vehicle elliptical spring of: (1) Two pairs of vertical guides; (2) means for securing the end of the lower member of the spring (that is, the axle-spring) between the pairs of guides; (3) two pairs of sleeves surrounding said guides; (4) means for pivotally supporting the end of the upper member of the spring (the body-spring) between, and directly by, the pairs of sleeves; (5) a plate secured to the lower ends of said guides; (6) coiled springs surrounding said guides; and (7) supported intermediate said plate and said sleeves.

It will be readily seen that this claim does not require a rigid connection between the guide rods and head blocks, nor between the former and the bottom plate. As thus construed the J. M. device has all the elements described, as well as several others, due to the improvement of welding a casing or cylinder to the bottom of each sleeve, which surrounds each coiled spring and each circular bottom plate, and providing that each bottom plate shall move like a piston in the bottom of its own cylinder. The bottom plates do not actually move relatively to the head or upper shackle bolt, but do so relatively to the sleeve and casing. These additional elements are undoubted improvements on Tilt, and produce the additional important function of relieving twisting or tortional strains, thus diminishing friction on the guides and sleeves, and lengthening the life of the device; possibly also improving the shock-absorbing function.

Of course the fact that defendants' device reads on the patent claim is by no means conclusive on the question of infringement, and I felt quite clear on the hearing, up to Mr. Carter's closing testimony, that the structural and functional distinctions between the two forms were enough to avoid infringement, and leave each party the benefit of his own discovery. But the more I have studied the structures and the evidence the more certain I have become that defendants' absorber has the same elements as plaintiff's, and that its distinguishing features are all by way of improvement or addition. The fact is, as I view the case, that each party has a spring sliding on a sleeve, different in details, but alike in means, combination, elements, function, operation, and result. Defendants' casing co-operates with the sleeve block and the bottom plate to extend and improve the sliding sleeve. The loose hairpin loop of the guides over the housings of the upper shackle bolt co-operate with the sliding bottom plates to relieve twist and strain. These are improvements, but without these features, however beneficial, the J. M. device would fully operate, and give substantially the same result. In other words, the J. M. contains everything found in the "Velvet," as well as other good things. Having trespassed on

plaintiff's territory, defendant should be compelled to vacate, since there is no way by which it can make use of its own improvements without also using what belongs to the plaintiff.